Case No. 24-1880, Murphy Medical Associates v. 1199SEIU National Benefit Fund. Good morning, your honors. My name is Roy Breitenbach and I'm with the firm of Harris Beach, Mirtha Kalina, and we represent the appellant, Murphy Medical Practice and the Murphy Medical Practice entities. This comes before the court on an appeal from the of a motion to dismiss. My client is a provider of laboratory services, COVID-19 laboratory services. The court below dismissed the case based upon failure to exhaust administrative remedies. Failure to exhaust administrative remedies under the case law is an affirmative defense. However, the well-pleaded complaint rule does say that we have to have something, and the courts have held, to establish that at least there was some exhaustion of administrative remedies or futility, right? Because we can make a clear and positive showing the case law says that exhaustive administrative remedies was futile. And here, taking into account, it is our contention that this is a pre-answer motion to dismiss. This is our pleading in this case. We believe we've had, we've alleged enough under Iqbal and Schwarmberg. How does your pleading show that it was futile? Well, Your Honor, first of all, we established, number one, that we were not informed that- That has nothing to do with futility. Futility means there was no point my bringing an appeal because history shows that, history or whatever it is, shows that an appeal would just automatically have been rejected. That there was just a waste of time and money and effort to bring an appeal. Yes, that is true, Your Honor. However- That wasn't told as a different sort of complaint. It may be a good point, but it's not futility. It's a different thing. But the regulations of the case law also says that if the plan did not comply with the requirements of the ERISA claim regulation, in terms of informing persons or the other aspects of the ERISA claim regulation, that is deemed to be futility. And I think- I'm sorry, that you weren't properly informed of the- Correct. Duty to exhaust? That we weren't properly informed of the mechanism. Of the mechanism. Of the mechanism. Because we weren't, this was an unusual situation, right? Because generally, okay, out-of-network providers such as my client are not the ones who do the appeals or if they do it, they do it under an assignment of benefits. So you were bringing a claim on behalf of a participant- Correct. To whom you rendered services. So you were really bringing the participant's claim. Under an assignment of benefits and also, Your Honor- And the participant had been notified of the need to appeal and had all the documents and you could have gotten it from them. Well, Your Honor, that's not necessarily the case because of the fact this was COVID-19 and the direct reimbursement was to us. Under FCRA and the CARES Act, it was our obligation. It was a direct payment to us and it was- the concept was that we were supposed to be taken out of the- the patient was supposed to be taken out of the equation. It wouldn't take much for a lawyer to realize in your firm that- or whoever was representing them at the time- that their exhaustion- exhaustion was required. It's axiomatic in these claims. Well, I think Your Honor has to take a step back and see- I'm wondering whether there's even a case that ever excuses exhaustion. Well, Your Honor, I think you have to take a step back and understand that these were relatively small thousands of COVID-19 tests being performed during the pandemic and this was the- this was the physician provider who was getting these explanation of payment forms back, who was not understanding the proper way to appeal, who saw that everything- the vast majority of them were being denied. Well, hold on about that. There was 496 you submitted and 172 you got reimbursement in the first instance. That's about a third. Okay. So why would you think it would be futile not to appeal the remaining two-thirds? Because I think that when he's- when my client attempted to raise the issues with the carrier, there was no movement in the carrier's position. But that's a different person. If there's an exhaustion problem, an exhaustion process, then there's a- there's a mechanism for that. Those people are automatically asking- every time there's an exhaustion claim that's made, the recipient of the money has been turned down. And that doesn't mean that it's futile to go through the exhaustion process. I understand what Your Honor is saying. Which is what you're- the argument you're making. Right. I understand it. But I think given the unique circumstances here, given the fact that it was in the middle of the COVID-19 pandemic, and the provider was doing a lot of these claims, and given the circumstances, and given the fact that under the Families First Coronavirus Relief Act and the CARES Act, the number- you know, a lot of the denials that were issued by the- it is our contention that was issued by the appellee, were not permissible denials under FCRA and the CARES Act. I think that when you put all of those allegations together, we believe it is enough to make it plausible to at least go us to the next stage of the lawsuit to demonstrate futility. So what does it say in your complaint to justify or to support the proposition that it was somehow unreasonable to expect you to go to any one of the partici- of the hundreds of participants whose claims you were bringing and- and- and- and get from them the planned documents? Well, first of all, Your Honor- That explain the- the whole appellate process. I don't believe that the individual members have the planned documents. I don't also believe- No, I don't- I'm not asking you what you believe. I couldn't care less what you believe the issue is or what I believe. The issue is what's in the complaint. There is nothing in the complaint on that issue, Your Honor. That's a- that's a problem, isn't it? Under your view of the- of the case, yes. And what other view? Under what view would it not be a problem? Well, Your Honor, I think that under- it is our position under FCRA and the CARES Act that the- that the individual member was taking out of the equation and we were dealing directly with the plan. So all information regarding the appeals and everything else should have come directly to us. This was a unique circumstance. Does the plan say- does the complaint- I'm sorry, does the complaint say that you requested the information from the plan? No, it does not, Your Honor. And why is that not a problem? Because, again, I think we were- we were dealing directly with the plan itself. And, well, what the complaint does allege is that we engaged in conversations and communications with them to ascertain how to appeal and how to do it and we think that that's enough. What does it say that you said? Does it say that you said, please- please explain to us or show us the tell us how we go about appealing? It does not- it does not allege that level of specificity, Your Honor. What does it say? It says that we engaged in conversations and dialogue with the- with the plan. Well, of course you did because you wanted more money. But that wasn't meaning- that- that- that doesn't- that wasn't invoking the exhaustion. That goes back to my earlier point. I understand your point, Your Honor. It doesn't invoke the exhaustion. Just to be clear, you're not arguing anymore that you actually exhausted the- No. Correct. Yes. Yes. If Your Honors have no more questions, stand on the rest of the right brief. Thank you. Thank you, Counselor. Should I lower this? Let me be as low as it goes. Okay. There it goes. Thank you. That's great. Thank you. I appreciate it. Good morning and may it please the Court. Elizabeth Chesler on behalf of the 1199 SEIU National Benefit Fund. The Murphy practice has brought a single claim for plan benefits under ERISA 502 A1B in its capacity as the member's assignee. But it is now acknowledged that it has abandoned any argument that it has actually exhausted the fund's administrative appeals. And it does not allege any facts that could support a clear and positive showing that would be futile to exhaust the plan's administrative remedies. The District Court properly dismissed the amended complaint with prejudice on this basis upon a longstanding, unambiguous Second Circuit precedent that when it is evident on the face of a complaint that a claimant has not exhausted administrative remedies or made a clear and positive showing that it would be futile to do so, the complaint should be dismissed. What do you say to their argument that they didn't get any direct notice? The SBDs went to the participants and not to them, and therefore they didn't get any direct notice of the obligation. Right. So they've brought this claim in their capacity as an assignee. Under ERISA, providers do not have any right to appeal. They have no direct right to appeal under ERISA. Nothing in FCRA CARES changes that. It can be authorized by the participants. Sure, yes, exactly. They can bring a claim in their capacity as an assignee, but that does not mean that they have any independent right under ERISA to be notified of the fund's appeals process. You're not claiming that it was inappropriate for them to be claiming on behalf of the participants? No, no, of course not. It's just who has an entitlement to get the appeals information. When you are recognizing them, which you haven't contested at least at this point in the proceeding, as a person who was entitled to make a claim on behalf of hundreds, a large, very large number of participants, wouldn't it have been appropriate for you when you see that in hundreds and hundreds of cases they have not appealed and they apparently don't know anything about the appeal obligation? Wouldn't it be reasonable for the law to interpret that in those circumstances you would have an obligation to tell them you've got to appeal, this is how you do it? Well, again, it's not the provider's right to appeal. The member can assign their right to recover the plan benefit to the provider, but that really has no bearing on whether under ERISA claims procedure the provider is independently entitled to receive the SPD. You are denying your plan participants the opportunity of getting the providers claim against them paid by the plan. Well, the members, I guess a few points, the explanation of benefits that goes to the members, those do contain appeal information. Also, there is no hiding the ball. Our SPDs are available on our website. There are any number of this information is not available to somebody who's not a plan participant. Yes, it's publicly available on our website. The SPD has the full appeals information. So they have to be able to see the public. You didn't say look at our website for exhaustion. You never told your adversary's client that. It's not. They have not alleged. You're saying there's no obligation for us to do that. We just sent out the SPD for the participants and that's as far as we have to go. That's what you're saying. Well, and, you know, I think counsel has acknowledged that they don't allege that they ever asked for it. So there's no affirmative obligation on the plan to provide providers with appeals information because they do not have appeals rights under ERISA. Did the participants receive information about the appeals process? Yes, it's on the EOBs and when you tell us, I'm sorry, go ahead with your answer. I was just going to say that the but when you tell us that the information was available to anybody on your website, I don't think, are we allowed to consider that? This is a 12b6 issue and what the scope of information that we're allowed to look at is what's alleged in the plan. And this is something that you say in your defense, but it's not part of the information that we, is it part of the why can we consider that with respect to a 12b6 dismissal? Well, that's something that would be headed in the direction of summary judgment because it would rely on information that's outside what's in the complaint. Sure. So two points. The court really does not need to consider it because again, there's no legal obligation for the fund to provide this information directly to providers, but the court can consider it because it's a matter of public record. Okay. Just so I understand it properly, the actual recipients of the, of the services, do they, they actually are, they have the participants themselves, the people who this, this client represents, they have, they can authorize them to pursue administrative remedies on their behalf, right? Yes. So to pursue an administrative appeal, the member would have to authorize them to pursue the appeal on their behalf. There's no allegation that that has happened here. And to initiate this litigation, yes, there would have to be a valid assignment that they are standing in the shoes of the beneficiary to bring this claim. Because again, it's the member's right to the benefit. Vicar Cares doesn't change it. This is the member's right to the benefit. It has nothing to do with the Murphy practice's direct entitlement to reimbursement under Vicar Cares. So how should this have played out then if, if, if the member wanted to appeal? So that the member gets a notice saying claim denied, explanation of benefits, here's information about the appeal. Then that member takes it to the Murphy practice or sends it to the Murphy practice, says this was denied. Can you appeal? It can go in either direction. The Murphy practice gets an explanation of payment seeing that the claim is denied. It can go to the member and say, we should appeal this. Please authorize me and then pursue the appeals. Well, if they knew about it, that's a good question. I mean, maybe, maybe it's, I don't know enough about the ERISA industry and whether this is just commonly understood and any good lawyer would know that you have to exhaust or whether you need specific notice. They're saying they need a specific notice that they didn't get it. I don't think that there's any support for that proposition. This is very standard. Um, and I realized that I'm going a little bit outside the record here, but I want to answer your Honor's question. This is standard practice. A claim is denied. Uh, out of network provider wants to challenge that you, you pursue an administrative appeal. I mean, this is not anything out of the ordinary. What do you think explains, uh, I think he's, you're ever sure he said that, you know, part of this was the confusion about COVID and what was happening at the time and everything was sort of in a, in a state of flux. But what do you think the reason was that they didn't pursue an administrative appeal? This obviously is speculation. I don't know what was going through the Murphy practices mind. They, they might not have thought that they had to, they might've, and I'm going to go back to quite a while. You were, your, your, your client was, was, uh, allowing certain adjustments to be made upon their request and that kind of thing. So I have the impression that you were sitting back, keeping your fingers crossed that they didn't know they had a right to appeal and therefore wouldn't. Um, but, but, uh, and, you know, I'm not saying that you had unclean hands necessarily, but maybe you hadn't washed them. Yeah. Your honor. I, I, I respectfully disagree with that. I don't think there's any support for that in the record. We want members to go through the administrative appeal process. We want members to get the benefits that they're entitled to. If a member or a provider disagrees with our benefit determination in the first instance, appeal it, tell us why we're wrong. So there's nothing in the record to suggest that we would want to suppress that. That's not, that's not the funds imperative here. The, the back and forth, I'm sorry if I'm dismayed, the back and forth that the Murphy practice is pointing to, and we put this in our papers, that was the fraud and abuse department after all of the claims had been submitted. So there was no sitting back hoping that they wouldn't exhaust and that there were any communications between the parties that could be construed as an appeal of the denied claims. That was, that's an entirely different process. They have not alleged any conversations with any kind of specificity outside of that process. And their documentary evidence about these allegations completely undermines their allegations that these were in the context of administrative appeals or even... But wasn't what you did very bad for your planned participants? Because the plaintiff here rendered services to them. There was a shared expectation between the, between Murphy and the planned participants that the, the charge, the charge incurred for the services rendered would be covered by the plan. But I, I would assume that the plaintiff has the right to collect from the members if the plan, which is, which was insured, which was thought of as the guarantor of the, of the payment of the sum, didn't come through, that Murphy could still collect from, from all your participants. And, and that would end, and they would then not get the benefit of what they were entitled to under the, under the plan. Doesn't that leave them, leave your participants holding the bag because you, because you didn't go to Murphy and say, look guys, you got to appeal. This is how, look at our plan. This is how you do it. You can look at your, the plan and see how you do it. It's all written there. So we, we, we tell the member and that who has, that's who has the right to appeal. But to answer your Honor's question, these claims are not all a monolith. So, I mean, if you look at the underlying facts, and unfortunately, because they did not administratively appeal, we don't have a full record of all the claims, but these are not all straightforward, you know, COVID claims. We denied, as the record shows, some of these because they are employment-based testing. But they all have a common problem, failure to appeal. Yes, but if the issue is whether the members are left holding the bag, I guess there are two separate... Why aren't they left holding the bag? Well, there are two separate, first of all, we did cover many of the claims. I mean, we covered about a third of the claims. Yeah, but I'm talking about the ones that you talked about. Okay, so there are two separate issues here, right? To the extent there's an argument that the funds coverage did not comply with the terms of FCRA CARES, that's not a claim under ERISA A1B, right? So ERISA A1B is this member entitled to this benefit. That is a case-specific determination. And if we have rejected or denied a specific claim because it doesn't follow under the terms of the plans, and at least in our view, it falls outside the scope of FCRA CARES, then the claim should be denied. That's appropriate. If someone takes issue with the basis of our denial, the appropriate remedy is to appeal. It is not to ignore administrative remedies and run to court. Because there's no... You cannot say that it is futile to appeal until you've gone through the process or attempted to go through the process. Oh, I'm sorry. Let me try again. My question was, didn't you, for failure to say to Murphy, you've got to appeal, look at our plan documents, and they'll show you how to do it. For failure to say that, you've left your plan participants holding the bag for $800,000 of services that were not reimbursed. Is that a good thing? Is that a good and appropriate thing? Plan participants were entitled to get them paid, and the only reason why... Well, I mean, there might have been other reasons. Maybe there were other defects. But so far as we know, there was no defect other than failure to appeal. Well, we would dispute that all of these claims should be covered. I mean, as I'm understanding Your Honor's question... You dispute that all of them? You say none of them should have been covered if they had been appealed? No, no, of course not, Your Honor. That's the point of the administrative appeal. But if the presumption is that the initial denial is improper and we're just abandoning our members, we informed members of their appeal rights. Members know and providers know. It is, I think, disingenuous to suggest that providers are unfamiliar with this. Not disingenuous, Your Honor, but disingenuous in general to suggest that providers do not understand administrative appeal rights. This is bread-and-butter claims administration. The goal is not to leave the members on the hook for claims that should be covered under the law. We've done our best to adjudicate the claims in the first instance based on the information submitted. If the member or the Murphy practice thinks that discrimination is wrong, the appropriate remedy is to appeal. And only when there's a final benefit determination by the trustee is it appropriate for judicial review. So when Murphy submitted a claim on behalf of a member, what response was made when there's a denial and the denial is based on failure to appeal, failure to pursue administrative remedies? What happened in terms of documents going out from the to express the rejection of the claim? Oh, so I'm sorry. What was sent to who? I might have, maybe I'm misunderstanding. So a claim would not be denied for failure to exhaust. A claim would not be denied for failure to exhaust. A claim would be denied, for example, that it was an employment-based COVID-19 testing. That our plan does not cover employment-related screenings and the Ficker CARES Act does not require health plans to cover employment-based screening. So for example, we might've denied a claim on that basis. We would then issue an explanation of payment to the provider, identifying the exact basis upon which that claim was denied. We would send that same information to the member. Here is why your claim is denied. And the member would get some additional verbiage saying, if you want to appeal this determination, see page X of your SPD. So that is the information that would then go out. They can then appeal that adverse determination or not. The exhaustion is just what is required to initiate this litigation. But you denied, you didn't deny directly to the participants, you denied to Murphy, didn't you? They presented the claims and then it was denied and then they argued with you and tried to get more and it was denied. We're talking about not the ones that you honored in some way, but that didn't involve the participants. That involved Murphy. And is there anything in the record that indicates that you told Murphy that if you want to pursue this, you can do it by exhaustion procedure? So when the claims are denied, it is not just between the fund and the payer. There is a communication, the explanation of benefits that goes to the member and an explanation of payment that goes to their provider. And it is... Didn't Murphy present claims to you on behalf of the participants? Yes, and when the fund... But you didn't respond to Murphy, you responded to the participants? We responded to both. To both? Yeah, an explanation of payment. You gave an SPD, you said look at the SPD to the participants. You just said that a minute ago, right? Yes. But not to Murphy. Right, because under ERISA, there is no obligation to provide appeals information to participants. They have no direct rights under ERISA. Non-participating providers have no relationship with the fund to the extent they want to pursue a claim for benefits on behalf of the participants. They have to get an assignment, but there's no direct relationship between us. There are no independent rights between the fund and a non-participating provider. And just to quickly touch on a point your honor made about how there were... There's some kind of back and forth between the fund and the Murphy practice where they're trying to get more reimbursement. I don't believe that that is supported in the record. Oh, I'm sorry. Maybe I misunderstood. I thought that when you denied a claim and then there was a further discussion afterwards, which they claimed or did claim at one point was starting the exhaustion process, but there's a further discussion that that discussion is between you and a participant doesn't involve Murphy. Is that what it is? I'm sorry, your honor. Do you mind saying that claim? They get turned down. They think that you were wrong. And immediately without invoking the appeal procedure, they contact you at the initial level to try and get this straightened out so they really understand what the situation is. And in some of those cases, you said, okay, yeah, you're right. Well, a lot of the time, and some of them, most of them, you didn't. And then my question is after that, is what, I mean, you, but they're working through Murphy at this time, right? So the exchange that you're describing where they informally reached out to us and we said, oh, okay, we'll cover some of those and others we won't. I don't see that in the record or their papers. Oh, I thought I had, I had information that there was something like 800 claims and 200 and some odd were partially responded to. In this litigation there, they alleged that there was testing for 53 people and it was a total of 490 claims from March 2020 through January 2021. Approximately 490 claims for 53 people. That's what's disputed. One of the things that your adversary is arguing is that the plan pressured participants not to reveal information about the plan to Murphy. What do you say to that? I find the allegations to be perplexing and irrelevant because, just to explain, the claim under ERISA 502A1B is the member's claim. So to say that the member didn't know, to tie it into some kind of futility or wrongful plan practice argument, to say that the member did not know that they were in their own fund? I said they're arguing, if I understand correctly, they're arguing that the plan pressured its members not to give plan information, meaning in this case appeals information, how you go about appealing. Don't give that information to the non-participants. So the allegations, as I understood them, was not that the plan was pressuring members not to share appeals information. What they're alleging is that members were being encouraged to hide their insurance information. At the time they presented for the claim that the members were told not to present their insurance information and so the Murphy practice had to seek reimbursement from the government. And I really struggle to see how that fits into a framework for a claim under ERISA 502A1B, even assuming that they are true, which of course the fund does not concede. Thank you counsel. Thank you. We'll take the case under advisement.